## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| AgFeed USA, LLC, et al. | : Case No. 13-11761 (BLS) |
| | : |
| Debtors. | : (Jointly Administered) |
| | : |
| JLL CONSULTANTS, INC., NOT INDIVIDUALLY BUT SOLELY AS TRUSTEE OF THE AGFEED LIQUIDATING TRUST, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Adv. Pro. No. 15-50929 |
| | : |
| GOLDMAN KURLAND & MOHIDIN LLP and PICKARD AND GREEN, CPAs, FOUR TONG INVESTMENTS, LTD., a/k/a and/or d/b/a FOUR TONG INVESTMENT LTD., and JOHN DOE DEFENDANTS 1 THROUGH 10, | : |
| | : |
| Defendants. | : |

---

### OPENING BRIEF OF DEFENDANT
### GOLDMAN KURLAND & MOHIDIN, LLP IN SUPPORT OF THE MOTION TO
### WITHDRAW THE REFERENCE TO THE BANKRUPTCY COURT
### AND TRANSFER THIS PROCEEDING TO THE
### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

Dated: 12/4/2015                    **TYBOUT, REDFEARN & PELL**

*/s/ Seth J. Reidenberg*
Seth J. Reidenberg
750 Shipyard Drive, Suite 400
P.O. Box 2092
Wilmington, DE 19899
T: 302.658.6901
F: 302.658.4018
sreidenberg@trplaw.com

4344046.2

and

Michael P. Luongo, Esquire (*pro hac vice pending*)
Jonathan S. Ziss, Esquire (*pro hac vice pending*)
**GOLDBERG SEGALLA LLP**
1700 Market Street, Suite 1418
Philadelphia, PA 19103
T: 267.519.6800
F: 267.519.6801
mluongo@goldbergsegalla.com
jziss@goldbergsegalla.com

*Attorneys for Defendant*
*Goldman Kurland & Mohidin LLP*

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................ 1

II.     STATEMENT OF FACTS ..................................................................... 2

III.    ARGUMENT ...................................................................................... 4

    A.     Withdrawal of reference should be granted because the Trustee's claims against Goldman Kurland are not "core proceedings." ........................ 4

    B.     Withdraw of reference should be granted because the Bankruptcy Court does not have constitutional authority to enter final judgment on state common law causes of action. ...................................................... 6

    C.     Goldman Kurland's right to a jury trial further supports withdraw of reference. ................................................................................... 7

IV.     CONCLUSION .................................................................................. 8

## TABLE OF CITATIONS

**Cases**

*Binder v. Price Waterhouse & Co., LLP*, 372 F.3d 154 (3d Cir. 2004) ………………......... 5-6

*Resolution Trust Corp. v. Pasquariello*, 16 F.3d 525, 531 (3d Cir. 1994) …………............... 7

*Stern v. Marshall*, 131 S. Ct. 2594, 2604 (2011) ………………………………................... 4-7

*Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1939 (2015) ………….................... 4

**Statutes**

28 U.S.C. § 157 ………………………………………….................................... 4-5, 7

28 U.S.C. § 1334 ……………………………………….................................... 4

## I.   **PRELIMINARY STATEMENT**

Defendant Goldman Kurland & Mohidin, LLP ("Goldman Kurland) submits this Opening Brief in support of its motion to withdraw reference of the instant adversary proceeding to the United States Bankruptcy Court for the District of Delaware and to transfer it to the United States District Court for the District of Delaware.

JLL Consultants, Inc. filed this adversary proceeding as the Chapter 11 Trustee of debtors AgFeed USA, LLC, et al. The complaint asserts claims against two accounting defendants: Moving Defendant Goldman Kurland and Co-Defendant Pickard and Green, CPAs. The claims against the accountants involve state law causes of action arising out of alleged professional negligence. These state law causes of action are not "core proceedings" under federal law and thus are not related to the debtors' bankruptcy proceedings. Because these claims are not related to the bankruptcy proceedings, the bankruptcy court is without authority to enter a final judgment absent consent of the parties. Goldman Kurland does not consent to the judgment of the Bankruptcy Court. Therefore, the action must be transferred to the United States District Court for District of Delaware. Transfer is likewise necessary because the Bankruptcy Court does not have constitutional authority to enter final judgment on state common law claims against a non-debtor such as Goldman Kurland. Finally, transfer of the adversary proceeding to the District Court will permit a jury to determine the claims asserted against Goldman Kurland—a right that would be denied to Goldman Kurland in Bankruptcy Court.

Co-Defendant Pickard and Green, CPAs has filed a separate motion for withdraw of reference in this action that is currently pending before the Court. Pickard and Green's motion asserts similar arguments and seeks the same relief that Goldman Kurland requests in the instant

motion. For the reasons stated herein, and in Pickard and Green's opening brief, Defendants' motion for withdraw of reference should be granted.

## II.   STATEMENT OF FACTS

On July 15, 2013, Debtors AgFeed USA, LLC, et al. ("AgFeed" or "Debtors") filed a voluntary petition under Chapter 11 of the Bankruptcy Code. On November 4, 2014, the Bankruptcy Court entered an order confirming the Debtors' Revised Second Amended Chapter 11 Plan of Liquidation Supported by the Official Committee of Equity Holders. JLL Consultants, Inc. (hereinafter "Trustee") was appointed as the Liquidated Trustee of the Debtors.

On July 15, 2015, Trustee commenced the instant adversary proceeding by filing a complaint against Defendants Goldman Kurland, Pickard and Green, CPAs, Four Tong Investments, Ltd. a/k/a/ and/or d/b/a Four Tong Investment, Ltd. and John Doe Defendants 1 through 10. A copy of the complaint is attached as **Exhibit A**.

Trustee asserts that AgFeed was a manufacturer and seller of animal nutrition products in China, and that it was formed out of a reverse merger of a Chinese-based hog and feed producer and Wallace Mountain Resources Corp., a Nevada shell corporation that became AgFeed. **Exhibit A** at ¶ 1. Trustee further asserts that AgFeed operated solely in China from its inception through the summer of 2010. *Id.* at ¶ 2. According to Trustee, in September of 2010, AgFeed purchased U.S.-based hog producer M2P2 LLC and began a transition to a U.S.-centric board of directors and officers. *Id.* at ¶ 4. Trustee claims that from 2007 to 2010, AgFeed reported exponential growth on its financial statements, which Trustee alleges was the result of materially inaccurate financial reporting to the Securities and Exchange Commission, AgFeed shareholders, and investors. *Id.* at ¶ 6.

Goldman Kurland is an accounting firm with its only office located in Encino, California. *Id.* at ¶ 12.  Trustee alleges that Goldman Kurland provided accounting services to AgFeed from approximately 2006 to 2013, that it audited AgFeed's 2008 and 2009 annual financial statements filed with the SEC, and that it performed work for AgFeed in connection with the special committee investigation and related restatement issues from August 2012 to June 2013. *Id.*

The Complaint alleges that Goldman Kurland committed professional malpractice in that it failed to detect fraudulent activity and in outsourcing certain audit activities. *Id.* at ¶ 56.  The Complaint further alleges that Goldman Kurland failed to comply with Generally Accepted Auditing Standards ("GAAS") and that it violated Generally Accepted Accounting Principles ("GAAP"). *Id.* at ¶¶ 59, 80.  The Complaint asserts the following claims against Goldman Kurland relating to its alleged professional malpractice:   Professional Negligence (Count I), Gross negligence (Count II), Breach of Contract (Count III), Negligent Misrepresentation (Count IV), Fraudulent Transfer (Count V), Recovery of Avoidable Transfers (Count VI), Disallowance of Claim pursuant to 11 U.S.C. § 502(d) (Count VII), and Unjust Enrichment (Count VIII). *See* **Exhibit A**.

The Complaint likewise alleges similar claims against Co-Defendant Pickard and Green, CPAs, for allegedly negligently compiling and reviewing AgFeed's annual and quarterly financial statements. *Id.* at ¶ 105. Pickford and Green, CPAs filed a Motion for Withdraw of Reference to the Bankruptcy Court on November 11, 2015, arguing that the claims against it in the Complaint do not involve a core proceeding under 28 U.S.C. § 157(b)(2), and that the Bankruptcy Court therefore may not enter a final order or judgment against it. Pickford and Green, CPAs' motion is pending with the Court.

The same facts and law that support Pickford and Green, CPAs' motion for withdraw of reference also support the instant motion of Goldman Kurland for withdraw of reference to the Bankruptcy Court. Namely, the Trustee's claims against Goldman Kurland arise entirely out of allegations of professional malpractice, which do not involve a core proceeding under 28 U.S.C. § 157(b)(2). Accordingly, Goldman Kurland's motion for withdraw of reference should be granted because the Bankruptcy Court may not enter a final order or judgment against it in this action.

## III.   ARGUMENT

### A.   Withdrawal of reference should be granted because the Trustee's claims against Goldman Kurland are not "core proceedings."

The district courts of the United States have "original and exclusive jurisdiction of all cases under title 11." 28 U.S.C. § 1334(a). Under 28 U.S.C. § 157(a), each district court may refer cases and proceedings arising under Title 11 to the bankruptcy court for that district. *See* 28 U.S.C. § 157(a). However, the district court may withdraw from the bankruptcy court, in whole, any case arising under Title 11, "for cause shown." *See* 28 U.S.C. § 157(d).

Bankruptcy judges are authorized to hear and enter final judgments in "core proceedings." 28 U.S.C. § 157(b)(1); *Stern v. Marshall*, 131 S. Ct. 2594, 2604 (2011). In contrast, bankruptcy courts may hear and determine non-core proceedings only "with the consent of all the parties to the proceeding." 28 U.S.C. § 157(c)(2); *see Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1939 (2015). Thus, if a proceeding is not a core proceeding, and the parties do not consent to the bankruptcy court proceeding, there is "cause shown" to withdraw the matter from the bankruptcy court. *See Sharif*, 135 at 1939.

"Core proceedings" mean proceedings that that arise in a bankruptcy case or under title 11, and include the following types of matters:

> (A) matters concerning the administration of the estate;

4

(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;

(C) counterclaims by the estate against person filing claims against the estate;

(D) orders in respect to obtaining credit;

(E) orders to turn over property of the estate;

(F) proceedings to determine, avoid, or recover preferences;

(G) motions to terminate, annul, or modify the automatic stay;

(H) proceedings to determine, avoid, or recover fraudulent conveyances;

(I) determinations as to the dischargeability of particular debts;

(J) objections to discharges;

(K) determinations of the validity, extent, or priority of liens;

(L) confirmations of plans;

(M) orders approving the use or lease of property, including the use of cash collateral;

(N) orders approving the sale of property other than property resulting from claims brought by the estate against persons who have not filed claims against the estate;

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims; and

(P) recognition fo foreign proceedings and other matters under chapter 15 of title 11.

28 U.S.C. 157(b)(2); *Stern*, 131 S. Ct. at 2604. Claims that arise under state law are not "core proceedings" under section 157(b). *Stern*, 131 S. Ct. at 2604.

In *Binder v. Price Waterhouse & Co., LLP*, 372 F.3d 154 (3d Cir. 2004), the Third Circuit considered whether state law malpractice claims against an accounting firm were "core proceedings" under section 157(b). The trustee in *Binder* alleged that the defendant accounting firm committed professional malpractice and breach of contract in connection with accounting and tax services performed for a litigation trust. *Id.* at 158. The accounting firm moved to dismiss on the grounds that the case did not involve a core proceeding. *Id.* at 159. The bankruptcy court agreed, finding that the claims did not affect the administration of the estate, property of the estate,

or liquidation of assets of the estate.  On appeal, the Third Circuit reached the same conclusion as the bankruptcy court, and determined that the matter was not a core proceeding because the malpractice claims against the accounting firm did not directly affect the debtor or the liquidation of the estate's assets.  *Id.* at 163.  The court additionally held that the claims lack a close nexus to the bankruptcy plan or proceeding to support jurisdiction of the bankruptcy court.  *Id.* at 169.

In the instant action, like in *Binder*, the Complaint does not involve a core because the Trustee's claims against Goldman Kurland do not arise under title 11, but instead involve state law claims relating to alleged professional accounting malpractice.  Because the proceeding against Goldman Kurland is not a core proceeding and Goldman Kurland does not consent to the jurisdiction of the Bankruptcy Court, the Bankruptcy Court does not have authority to consider the Trustee's claims.  Accordingly, the attached order should be entered withdrawing reference to the Bankruptcy Court.

> **B.     Withdraw of reference should be granted because the Bankruptcy Court does not have constitutional authority to enter final judgment on state common law causes of action.**

In *Stern v. Marshall*, *supra*, the Supreme Court held that non-Article III Bankruptcy Courts lack the constitutional authority to enter final judgment on state common law claims against a non-debtor, even if such claims fall within the category of "core proceedings" under 28 U.S.C. § 157(b)(2).  *Stern*, 131 S. Ct. at 2610.  The Court reasoned that Article III prohibits Congress from placing the final authority to resolve state law claims within the bankruptcy courts.  Thus, the fact that a claim is "core" is not dispositive of the Bankruptcy Court's authority to adjudicate the claim. *See id.* at 2614.

Because the allegations against Goldman Kurland arise from state common law causes of action for professional negligence and breach of contract, they may not be determined by a

bankruptcy court absent consent of the litigants. *See id.* at 2615. Additionally, because these claims involve a matter of private right, and do not affect the public at large, the claims do not fall within the public rights exception discussed in *Stern. See id.* at 2014-15.

      **C.**    **Goldman Kurland's right to a jury trial further supports withdraw of reference.**

Pursuant to 28 U.S.C. § 157, all bankruptcy court rulings in non-core matters are reviewable *de novo* by a district court. 28 U.S.C. § 157(c). Bankruptcy courts are consequently prohibited from holding jury trials, because it would result in the jury verdict being subject to review by the district court, in violation of the Reexamination Clause of the Seventh Amendment. *See Resolution Trust Corp. v. Pasquariello*, 16 F.3d 525, 531 (3d Cir. 1994). Because the Trustee's claims against Goldman Kurland are non-core, transfer to the district court is necessary to ensure its right to a trial by jury.

## IV.  **CONCLUSION**

For the foregoing reasons, Defendant Goldman Kurland & Mohidin, LLP respectfully requests that this Honorable Court enter the attach Order withdrawing reference to the Bankruptcy Court.

Dated: 12/4/2015                     **TYBOUT, REDFEARN & PELL**


/s/ Seth J. Reidenberg
Seth J. Reidenberg
750 Shipyard Drive, Suite 400
P.O. Box 2092
Wilmington, DE 19899
T: 302.658.6901
F: 302.658.4018
sreidenberg@trplaw.com

and

Michael P. Luongo, Esquire (*pro hac vice pending*)
Jonathan S. Ziss, Esquire (*pro hac vice pending*)
**GOLDBERG SEGALLA LLP**
1700 Market Street, Suite 1418
Philadelphia, PA 19103
T: 267.519.6800
F: 267.519.6801
mluongo@goldbergsegalla.com
jziss@goldbergsegalla.com

*Attorneys for Defendant*
*Goldman Kurland & Mohidin LLP*

# Exhibit A

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AgFeed USA, LLC, *et al.,*[1] | Case No. 13-11761 (BLS) |
| Debtors. | (Jointly Administered) |
| JLL CONSULTANTS, INC., NOT INDIVIDUALLY BUT SOLELY AS TRUSTEE OF THE AGFEED LIQUIDATING TRUST, | |
| Plaintiff, | |
| v. | Adv. Pro. No. _____ |
| GOLDMAND KURLAND & MOHIDIN LLP and PICKARD AND GREEN, CPAs, FOUR TONG INVESTMENTS, LTD., a/k/a and/or d/b/a FOUR TONG INVESTMENT LTD., and JOHN DOE DEFENDANTS 1 THROUGH 10, | |
| Defendants. | |

## COMPLAINT

JLL Consultants, Inc., not individually but solely as trustee (the "Liquidating Trustee") of

the AgFeed Liquidating Trust (the "Liquidating Trust" or "Plaintiff"), by its undersigned

attorneys, files this complaint (the "Complaint") against Goldman Kurland & Mohidin LLP

("Goldman"), Pickard and Green, CPAs ("PG"), Four Tong Investments, Ltd., a/k/a and/or d/b/a

Four Tong Investment Ltd. ("Four Tong") and John Does 1 through 10 and alleges as follows:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number, are: AgFeed USA, LLC (8748); AgFeed Industries, Inc. (7168); TS Finishing, LLC (8748); New York Finishing, LLC (8748); Pork Technologies, LC (2076); New Colony Farms, LLC (9246); Heritage Farms, LLC (8141); Heritage Land, LLC (8129); Genetics Operating, LLC (1921); M2P2 Facilities, LLC (8748); MGM, LLC (8748); M2P2 General Operations, LLC (8748); New Colony Land Company, LLC(5834); M2P2 AF JV, LLC (8748); Midwest Finishing, LLC (8748); and Genetic Land, LLC (1921).

## NATURE OF THE CLAIMS

1.      AgFeed Industries, Inc. ("AgFeed" or the "Company") was born out of the reverse merger of a Chinese-based hog and feed producer and Wallace Mountain Resources Corp., a Nevada shell corporation, which became AgFeed.  In October and December 2006, AgFeed completed a series of share exchange transactions (reverse mergers) through which it acquired three companies located in the People's Republic of China engaged in that country's domestic animal husbandry markets.  In October 2007, AgFeed obtained a NASDAQ listing (FEED) and began raising money through sales of stock to individuals as well as institutional investors.  The Company manufactured and sold animal nutrition products in China, and breed hogs in the United States and China.  AgFeed's animal nutrition business served hog producers throughout southeastern China through five feed mills where AgFeed produced primarily hog feed premix.

2.      From its inception through the summer of 2010, AgFeed operated solely in China. From 2006 through November 2009, its directors and officers consisted primarily of Chinese nationals: Songyon Li ("Li"), Liangfan Yan ("Yan"), Selina Jin ("Jin"), Lixiang Zhang ("Zhang"), and Junhong Xiong ("Xiong"), along with two U.S.-based directors Fredric S. Rittereiser ("Rittereiser") and Arnold Staloff ("Staloff").  Staloff served on the AgFeed's board of directors (the "Board") from November 2007 to December 2009.  AgFeed's audit committee (the "Audit Committee") was compromised of Staloff and Rittereiser from the time of its formation until December 9, 2009.  On that date, K. Ivan F. "Van" Gothner ("Gothner") replaced Staloff as the chair.

3.      The Company's founders played a large role in its operations: Li (Executive Chairman and Chairman of the Board) and Xiong as Chief Executive Officer ("CEO") assisted

by Chief Financial Officers ("CFO") Yan (2006 to 2009) and Jin (2009 to 2010). During most of this period—from August 2008 to 2011—Gerard Daignault ("Daignault") was the U.S.-based Chief Operating Officer ("COO"). Edward Pazdro was the CFO of International Protein Technology Corporation, an AgFeed subsidiary and eventually became AgFeed's CFO on November 9, 2010.

4.     In September of 2010, AgFeed completed the purchase of the U.S.-based hog producer M2P2 LLC ("M2P2") and related affiliates, and began a transition to a U.S.-centric board of directors and officers. Pazdro replaced Jin as acting CFO in November of 2010 and assumed the role formally in February 2011 concurrently with the resignations of Li and Xiong from their AgFeed roles. Daignault continued throughout this period as the COO.

5.     While AgFeed was solely a China-based operation, it expanded rapidly through cash infusions from early investors and the public markets. Through a series of issuances of stock and warrants, between December 28, 2007 and June 30, 2009, AgFeed raised approximately $95 million in capital, incurring transaction costs of $9.9 million in the process, which was paid primarily to investment bankers, stock promoters and/or placement agents, including Defendant Four Tong and the other similarly situated, yet-identified John Doe Defendants and to the firm Rodman & Renshaw, LLC. AgFeed reportedly used the remaining proceeds to expand existing operations and acquire thirty meat hog producing farms in China.

6.     From 2007 through 2010, AgFeed reported exponential growth on its financial statements. But this apparent growth was fabricated and was based on materially inaccurate financial reporting, which resulted in false financial reporting to the Securities and Exchange Commission (the "SEC"), AgFeed's innocent shareholders, and investors. Most notably, the China legacy farm operations reported the purchase and ownership of tens of millions of dollars

of fictitious assets, tens of millions in false profits arising from these fictitious assets, and fictitious accounts receivable coupled with the systemic understatement of doubtful accounts, and the material manipulation of its reported goodwill.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction of this action under 28 U.S.C. § 1334(b) because this action arises under, and is related to, the chapter 11 case of *In re: AgFeed USA, Inc.* Case No. 13-11761 (BLS) and related cases, all pending in the United States Bankruptcy Court for the District of Delaware (the "Court").

8.      This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the laws of the United States.

9.      This Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) because this action presents a controversy between citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

10.     Venue in the District of Delaware is proper pursuant to 28 U.S.C. §§ 1409(a) and (c).

## PARTIES

11.     The Liquidating Trustee was appointed to administer the AgFeed Liquidating Trust. On July 15, 2013, AgFeed USA, LLC and certain of its affiliates, including the Company, filed voluntary petitions (the "Petition Date") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the Court. On November 4, 2014, the Court approved the Debtors' Revised Second Amended Chapter 11 Plan of Liquidating Supported by the Official Committee of Equity Security Holders (the "Plan"). The Plan provides that as of November 10, 2014, all of the Debtors' assets shall be transferred and vest in the Liquidating Trust. The Plan

4

appointed the Liquidating Trustee, who has the right to, among other things, pursue causes of action, liquidate assets of the Debtors, and take such actions as are necessary and reasonable to carry out the purposes of the Liquidating Trust.

12.     Goldman is an accounting firm that provided accounting services to AgFeed from approximately 2006 to 2013. Goldman's only office is located in Encino, California. Goldman audited AgFeed's 2008 and 2009 annual financial statements filed with the SEC. Goldman also performed work for AgFeed in connection with the special committee (the "Special Committee") investigation and related restatement issues from August 2012 to June 2013. *No, we did not audit any restatements nor did any other CPA firm.*

13.     PG is an accounting firm that compiled and reviewed AgFeed's financial statements from at least 2009 to 2010. PG also provided AgFeed with many other accounting services and support. Upon information and belief, PG is located in Valencia, California.

14.     Four Tong is, upon information and belief, a duly formed business entity based in China with a last known address of 1603 Kinwick Centre, 32 Hollywood Road, Central, Hong Kong, China. Four Tong acted as a stock promoter and/or placement agent and/or investor locator for companies, such as AgFeed, that were shopping for investors to buy their stock, including though private placement. Four Tong was compensated when third-parties purchased, overpaid for and/or were stuck with AgFeed stock while and/or after being materially and justifiably misled by false, inaccurate and/or incomplete information that Defendants knew or should have known to be false, inaccurate and/or incomplete but did not investigate and/or correct. Four Tong's compensation when it assisted in the sale of stock or securities and/or was due a finder's fee included not just cash compensation, but also stock-based compensation, such as stock warrants that could be held and strategically and beneficially exercised in the future.[1]

---

[1] Non-Party Rodman & Renshaw, LLC a/k/a and/or d/b/a Rodman & Renshaw, along with its and/or their related and/or successor entities and affiliates (collectively, "Rodman & Renshaw") was a registered U.S. Broker-Dealer

15.     The yet identified John Doe Defendants 1 through 10 are located in the United States and/or China and are connected with the above named Defendants because, *inter alia*, in and/or around the same proximate timeframe they, while engaged in roles such as *inter alia*, consultant, advisor, accountant, investment banker, stock promoter and placement agent to AgFeed or its Board or its Officers, also unjustly enriched themselves by and through the sale and promotion of AgFeed stock to third parties who purchased, overpaid for and/or were stuck holding AgFeed stock while and/or after being materially and justifiably misled by false, inaccurate and/or incomplete information that Defendants and AgFeed's Board of Directors and Officers knew and/or should have known to be false, inaccurate and/or incomplete but did not investigate and/or correct.   While Plaintiff does not yet know the identity of the John Doe Defendants, the records in Plaintiff's possession and filings with governmental authorities, such as the SEC, indicate that other unidentified parties other than those specifically named as Defendants above unjustly enriched themselves in the same manner and through the same conduct, misrepresentations transactions and occurrences.

---

that, like Four Tong, acted as a stock promoter and/or placement agent and/or investor locator for companies, such as AgFeed, that were shopping for investors to purchase their stock, including through private placement.  Rodman & Renshaw was compensated when third-parties purchased, overpaid for and/or were stuck holding AgFeed stock while and/or after being materially and justifiably misled by false, inaccurate and/or incomplete information that it and Defendants knew or should have known to be false, inaccurate and/or incomplete but did not investigate and/or correct.  Rodman & Renshaw's compensation when it assisted in the sale of stock or securities and/or was due a "finder's fee" included not just cash compensation, but also stock-based compensation, such as stock warrants that could be held and strategically and beneficially exercised in the future. The role of non-party Rodman & Renshaw, which is a Chapter 7 debtor in a bankruptcy pending in the Southern District of New York, is provided herein as background.

## BACKGROUND[2]

### A.    The History of AgFeed

16.    Prior to its bankruptcy filing, AgFeed was engaged in the animal-nutrition and commercial-hog production business through its operating subsidiaries, Nanchang Best, Shanghai Best, and Guangxi Huijie in China, and M2P2 in the United States. As noted above, AgFeed went public on or about October 31, 2006, through a reverse merger with Wallace Mountain Resources Corporation. The reverse merger and initial public offering were orchestrated by Chinese stock promoter Tianbing "Benjamin" Wey®[3] ("Wey"). Wey is the President and CEO of New York Global Group ("NYGG"). Wey and his company NYGG were closely affiliated with AgFeed and Ahmed Mohidin ("Mohidin"), a partner at Goldman.

17.    With respect to AgFeed and many other Wey-promoted Chinese reverse merger companies, Wey used Mohidin, formerly a partner in Kabani & Co., to act as the lead engagement partner. Goldman also provided accounting services to at least three other companies associated Wey. Upon information and belief, Wey partnered Goldman with two Chinese-based accounting firms that are or were alter egos closely connected to Wey—Beijing

*[handwritten note in right margin: not true Austin has no relations with Ben]*

---

[2] More detail regarding the underlying fraud has been recorded in the complaints filed against former officer and directors, former Officer and Director Van Gothner, and other professionals. At this time, and without the benefit of discovery, it is uncertain whether some or all of the various facts alleged which involved the counts against the Directors and Officers and the other professionals are tied in whole or in part to the allegations against the defendants in this action. As a result, the factual allegations in *JLL Consultants, Inc., Not Individually but Solely as Trustee of the Agfeed Liquidating Trust v. Buchanan Ingersoll & Rooney, PC, Stevens & Lee, PC; and William W. Uchimoto, Esq.*, Adv. Proc. No. _____; *JLL Consultants, Inc., Not Individually but Solely as Trustee of the Agfeed Liquidating Trust v. K. Ivan Gothner*, Adv. Proc. No. 15-50210 (BLS); and *JLL Consultants, Inc., Not Individually but Solely as Trustee of the Agfeed Liquidating Trust v. Edward J. Pazdro, et al.*, Adv. Proc. No. _____; are incorporated by reference as if restated herein in full.

[3] On information and belief, Benjamin Wey claims a trademark on his name and asserts such trademark in defense of third party mentions of his name in written and on-line documents and publications, including legal documents. All mentions of Wey in this Complaint and any documents filed in or issued in connection with this adversary and these bankruptcy cases include the ® by reference.

AnShun International CPAs Co. Ltd. ("AnShun")[4] and Beijing Ever Trust CPAs Co. Ltd. ("BETL").[5]  Upon information and belief, these entities shared the same physical address in Beijing as NYGG from at least 2008 to 2010.  *Not true*

18.      Upon information and belief, AnShun receives approximately 90% of its revenues from aiding Goldman in auditing U.S.-listed companies; BETL receives 83% of its revenues from aiding Goldman in auditing U.S.-listed companies.  Between them, BETL and AnShun aided Goldman in twelve audits for the year ended December 31, 2010.[6]  Other than assisting Goldman's audits, BETL and Anshun performed no work for U.S.-based reporting companies.  Despite its limited involvement with any of these audit clients, Goldman nevertheless signed audit reports for all twelve companies.  Goldman's involvement was limited to drafting a planning memo and training Anshun or BETL personnel.[7]

19.      Wey invariably recommends that clients use Mohidin.  For example, Wey's client CleanTech Innovations, Inc. was removed from the NASDAQ after it concealed some of Wey's involvement with it.  CleanTech later sued the NASDAQ, and attached as exhibits certain of its formal communications with the NASDAQ regarding Wey's role.  CleanTech stated that Wey

---

[4] Source: China Recycling Energy Corporation, letter to SEC dated August 31, 2010, answer to question 8 [unpaginated].

[5] Source: AgFeed Industries, Inc., letter to Securities and Exchange Commission dated August 17, 2007, answer to question 34 [unpaginated].

[6] BETL's firms are Deer Consumer Products, Inc., SmartHeat, Inc, Shiner International, Inc., and FusionTech, Inc.; Anshun's firms are China Green Material Technologies, Inc., Zoom Technologies, Inc., Sunity Online Entertainment, Ltd., Weikang Bio-Technology Group Co., Inc., U.S. China Mining Group, Inc., Asia Carbon Industries, Inc., Asia Leechdom Holding, Corp., China United Insurance Services, Inc., and China Recycling Energy Corp.

[7] Sources: AgFeed Industries, Inc., letter to Securities and Exchange Commission dated August 17, 2007, answer to question 34 [unpaginated]; China Recycling Energy Corporation, letter to SEC dated August 31, 2010, answer to question 8 [unpaginated].

8

and NYGG had introduced it to a variety of law firms and investment banks, but only one auditor: Goldman.[8]

20.      In November 2007, AgFeed began to rapidly expand into the hog breeding and production business by acquiring a 90% stake in Lushan, a significant hog breeding operation in China. While AgFeed was solely a China-based operation, it expanded rapidly through cash infusions from early investors and the public markets. Through a series of issuances of stock and warrants, between December 28, 2007 and June 30, 2009, AgFeed raised approximately $95 million in capital, incurring transaction costs of $9.9 million in the process paid primarily to investment bankers and stock promoters. AgFeed reportedly used the remaining proceeds to expand existing operations and acquire thirty hog producing farms in China.

21.      By the end of 2008, AgFeed claimed to have acquired twenty-nine more meat-producing hog operations in China. AgFeed continued to expand through September 2010, when it made its largest acquisition—the U.S.-based hog producer M2P2. AgFeed also rapidly expanded its animal feed business by adding hundreds of new distributors and large farm direct customers.

22.      During 2008, AgFeed was still being advised by Wey, who appears to have functioned as a de facto board member. Among other activities, Wey was allowed to unduly influence the initial audit reports and public statements of AgFeed through, among other activities, regular communications and contact with Goldman and certain AgFeed principals and managers in China. For instance, in an email dated March 20, 2008, Mohidin recommended to Staloff, PG, and Li how the Company should treat the recent acquisition of hogs and certain assets on the Company's financial statements. Wey responded to Mohidin's email and disagreed

---

[8] Source: *CleanTech Innovations, Inc. v. NASDAQ Stock Market LLC*, Index No./653524-2011, Dkt. # 11-7, Exh. 4 (Email from William Uchimoto, counsel to CleanTech, to Michael J. Wolf of NASDAQ).

with his analysis and told him he would call him to explain. Likewise, on May 2, 2008, Brian North ("North"), an attorney from Buchanan Ingersoll & Rooney PC, emailed Mohidin, Kevin Pickard ("Pickard"), and Summer Xie, and explained the requirements for filing a Form 8-K and concluded that the Company must file it due to the hog farm acquisitions. Wey's response reveals just how much contact he had with Mohidin: "I have discussed with Ahmed [Mohidin] numerous times in the past about each specific hog farm acquisition and each hog farm's value that may trigger audit requirements. I don't think these hog farms individual fall into the audit requirements . . . .Therefore, disagree with the conclusions listed below."

23.    By the fall of 2008, certain directors and officers of AgFeed were aware of serious financial and operational issues and were concerned that information about these issues would become public. On November 29, 2008, Daignault observed in an email to Rittereiser and Staloff that the company's growing hog farm operations were not ready to meet U.S. accounting standards or keep management properly informed.

24.    In or around the same proximate timeframe, at and with the direction and/or assistance of Wey, the Directors and Officers of AgFeed were able to raise in excess of $90 million in capital through the sale and placement of its stock to the investing public. To raise such capital through the sale of its stock, AgFeed needed to hire, retain and join with various investment bankers, stock promoters and/or placement agents, in addition to the consultants, advisors and accountants already assisting the AgFeed Board of Directors and its Officers.

25.    These investment bankers, stock promoters and/or placement agents, included without limitation, Defendant Four Tong and Rodman & Renshaw, each of whom is believed to have had ties and/or past dealings with Wey and/or his affiliated companies and projects.

26.     From June 2007 through, at least, May, 2009, AgFeed insistently and/or repeatedly used Four Tong and/or Rodman & Renshaw and others to help unload its stock on the investing public with the help of false, inaccurate and/or incomplete information that Defendants, Rodman & Renshaw and the AgFeed Board and its Officer knew or should have known to be false, inaccurate and/or incomplete but did not investigate and/or correct.

27.     For instance, in June 2007, Defendant Four Tong received $240,000 in cash compensation and additional warrants to purchase as much as 180,000 shares of AgFeed for its role assisting in the private placement offering of 750,000 shares of AgFeed stock.

28.     Meanwhile, on or about April 21, 2008 Rodman & Renshaw received $600,000 in cash compensation as a placement agent in a transaction(s) whereby 625,000 shares of AgFeed stock was issued and/or sold to institutional investors. Then, on or about April 24, 2008 Rodman & Renshaw received another $638,401 in cash compensation as a placement agent in a transaction(s) where 1,322,836 shares of AgFeed stock was issued and/or sold to other institutional investors. Then, on or about December 31, 2008 Road & Renshaw received $525,000 in cash compensation as a placement agent and warrants to purchase 300,000 shares of common stock in a transaction(s) whereby 5,000,006 shares of AgFeed stock was issued and/or sold in a direct offering. Then, on or about May 8, 2009, Road & Renshaw again served as a placement agent and received, *inter alia*, a warrant(s) to purchase 244,613 shares of stock in a transaction(s) whereby 2,329,645 shares of AgFeed stock was issued and/or sold in a private placement offering.

29.     Other John Doe Defendants benefited and unjustly enriched themselves through the above stock sales, placements and offerings and others as well occurring before and after those listed and in the same general timeframe, and in the same manner as Defendant Four Tong

11

and Rodman & Renshaw. For instance, various SEC filings alone suggest fees, contingent fees, commissions, finder's fees that were part of transaction costs of these stock sales, offerings and placement may total close to $10 million dollars.

30.    AgFeed stock was sold and issued to the investing public even after Rodman & Renshaw raised concerns to AgFeed about its financials and reporting. For instance, in November, 2008, Rodman & Renshaw through Joe Giamichael accused the AgFeed Board in writing of hiding from its investors calling some of the then most recent AgFeed financials a joke. However, stock promoters and placement agents continued to assist AgFeed sell and/or place more of its stock and be compensated in return.

**B.    Issues in China**

31.    As the deadline to issue the 2008 10-K approached, internal emails among the most senior levels of AgFeed management indicated that the published numbers were false. A February 26, 2009 email from senior finance executive Zhou Feng ("Feng") to Li and Xiong, among others, conceded:

> In 2008, we adopted the strategy of "enlarging by faking" to develop the Company and we had been treading on thin ice; in 2009, we should dedicate to the strategy of "strengthening by strength" but we face a lot of pressure!
>
> "Faking" is temporary and the "enlarged" object is therefore empty and fragile; "strength" is long lasting and the "strengthened" object is therefore precious.
>
> We are very lucky in that we went through the process, enjoyed the fruit, challenged our limits and had self-reflection. We are now having difficulties because we have not yet understood the industry and the society, nor have we excelled themselves or had sufficient talented people in the management.

32.    On March 9, 2009, AgFeed issued its 2008 10-K under the signature of Xiong and Yan and it contained no reference to the strategy described in Feng's email.

33.     In a series of emails sent April 22-23 of 2009, Daignault and Rittereiser learned from Glenn McClelland ("McClelland") at M2P2, which was then involved in a joint venture with AgFeed in China, that McClelland had been cautioned against doing business with AgFeed because "people inside Agfeeds China [] are ripping off the company" by putting out "misleading information" to drive the stock price up in a scheme to dump shares at a peak price. Daignault informed Rittereiser by email dated April 23, 2009, that he had assured McClelland that this kind of activity "is a thing of the past," an apparent admission that such activities had in fact occurred or were strongly suspected to have occurred, though they were never reported to the public or, at a minimum, to the SEC.

34.     On or about May 7, 2009, AgFeed raised $10 million in a private investment of private equity ("PIPE") offering.  During this time, Rittereiser and Staloff were in regular communication about serious accounting issues in the Chinese legacy farm operations.  For example, on May 9, 2009, Daignault reported by email the following to Rittereiser, in the latter's capacity as a director and Audit Committee member, about Jin (AgFeed's CFO): "There is something drastically wrong with the way she understand [sic] credit management and what we have been representing" in financial reports.

35.     During this period, the Board began to consider replacing Goldman as auditor with a larger, more established firm.  In an email to Li dated May 22, 2009, Daignault described the rationale for terminating Goldman as a "move away from Kevin and Ahmed because of past baggage," to which Li responded favorably as a move to "get rid of those who have connection with 'that guy.'"  On information and belief, "that guy" referred to by Li was Wey, and "Kevin" was Kevin Pickard, a partner at PG.

36.     By the summer of 2009, Daignault, Rittereiser and Staloff knew that AgFeed was facing an increasingly large accounts receivable and collectability issue in China and that the legacy farm accounting systems were unreliable.  In August of 2009, Daignault reported to Rittereiser that AgFeed's accounts receivable had grown to $14.6 million, and that AgFeed had woefully inadequate internal financial controls.  Daignault described those processes in an August 10, 2009, email to Rittereiser as "inconsistent and chaotic."

37.     During this same period, AgFeed staff in China were openly acknowledging an accounting scheme.  In a July 10, 2009 email between Xiong and Jiangqi Wu, also known internally as "Kitty Wu," ("Wu"), Xiong conceded that the accounts receivable were inflated because "[t]he *profits of the non-existing businesses* are all kept in the accounts receivables." (emphasis added).  She warned that "[t]his can be easily detected by [the] external auditor," i.e., Goldman.  Xiong, in response, stated that her concern was shared by herself, then-Chairman Li, and the Board.

38.     By email dated August 10, 2009, Rittereiser stated to Staloff his concerns about the ramifications of not collecting the growing accounts receivable: "[T]he company is at risk," he stated, and acknowledged that "[s]ince SOX the Board is much more responsible for the business process[.]"  He further stated that he did "not want to answer anyone who is invested in this company or is about to ($50.0 million) if the AR issue hits the fan."  The $50 million referred to by Rittereiser was a pending arrangement for a line of credit with Southridge Partners II, LP ("Southridge") through which AgFeed could "put" shares to Southridge at market rate in exchange for a draw on the line.  On information and belief, AgFeed eventually drew substantially on the line at various dates to and through August of 2011, resulting in the issuance of substantial numbers of shares to Southridge and material dilution to AgFeed's stock.

14

39.     The financial reporting out of China did not improve in 2010 either in terms of competency or bottom line numbers, as the accounts receivable numbers continued to grow.

40.     On May 5, 2010, Daignault sent an email to Li, Xiong, and Jin containing a message from Rittereiser expressing outrage about the latest figures coming from the China legacy farms and the lack of competency in the reporting. In particular, Rittereiser expressed the following:

- "the executive management is failing in its job"
- "The financial reports that management agreed to provide are non-existent on a monthly basis as to their value."
- "quarterly reports are . . . somewhat inaccurate, incomplete, and way too late without any plausible explanation as to what the information is, where it came from and what it means"
- "Accounts receivable are up 60% in three short months"
- "Failure to account for this A/R run-up is a case of malfeasance by the executive team"
- "In November 2008 I was informed to throw you guys out but instead I stepped up and supported you"

41.     A month later, on June 7, 2010, Rittereiser sent another email to Xiong and Jin, copied to Yan, Daignault, Gothner, and Staloff, expressing outrage about the legacy farm practice of selling hogs at a loss and on credit in order to boost sales figures, which were booked as accounts receivable. Excerpts from this email (which was in all caps) include:

- "DO NOT TELL ME THAT THE EXPANDING SALES WILL HELP THIS COMPANY AT THIS TIME BY LENDING MONEY TO SUPPORT THE SALES"
- "COLLECT ... DO NOT LEND ANYMORE"
- "THIS IS A DISASTER, IF THIS KEEPS UP THE STOCK WILL TRADE AT $1.75 SOONER THAN YOU THINK"
- "ONCE THE INVESTMENT BANKERS REALIZE THE HUGE RISK YOU ARE TAKING THE FEED DIVISION DEAL TO SELL OFF 20% TO THE PUBLIC WILL NOT TAKE PLACE"

42.     On July 1, 2010, Jin circulated preliminary accounts receivable figures for the month closed June 30, 2010. In response, that same day, Daignault forwarded the email to Yan

15

with the comment, "[t]his is good news." He then went on: "I have a process to turn older ar into notes and move them from current assets to long term. This is a shell game but cleans up the balance sheet."

43.    During this same period, and throughout the summer of 2010, Goldman remained the Company's auditor. Mohidin, the Board, and the Audit Committee continued their on-going dialogue about how to reserve for the ever-growing accounts receivable. During this period, Pazdro, who was then CFO of subsidiary AgFeed International Protein Technology Corporation and of AgFeed's animal feed business, had joined these internal dialogues. Pazdro would succeed Jin as CFO of AgFeed in November 2010.

44.    During this period, Goldman began to raise issues about required impairment of goodwill based on the new reports of losses coming out of certain operations. In response to an email dated July 31, 2010, from Mohidin to Jin and Pazdro, among others, raising this issue, Pazdro forwarded the email to Daignault and Gothner with the statement: "Looks like we are going to have to address."

45.    By late fall 2010, Daignault was reporting that matters had not improved and, perhaps, were worse. In response to the delivery by Jin of the third quarter 2010 financials, Daignault stated to Rittereiser and Gothner by emails sent November 1, 2010:

- "This is a total disaster. We now have to put in a financial hit team."
- "We got limited numbers for Hog during the quarter and I believe this goes deeper."
- "This is such a mess. ... [A]ll I can conclude is the numbers I received on the excel file last night comparing quarters can not be right."

46.    In January of 2011, Rittereiser, Daignault, and Pazdro received preliminary 2010 financial reports on AgFeed's legacy farm operations that contained alarming figures, including

16

a reported $50 million plus drop in annual net income from 2009 notwithstanding an increase in revenues.

47.    Nevertheless, when AgFeed filed its Form 10-Q for 2010 in early 2011, it attributed the 2010 losses to factors other than the serious accounting issues that had been uncovered.

48.    In May 2011, AgFeed factored approximately $22 million in accounts receivable to a party believed to be affiliated with Chinese organized crime.  On July 10, 2011, Daignault told Milton Webster that he believed that the Company to that it factored its receivables was affiliated with "Chinese Mafia," and that Thomas Yang ("Yang"), AgFeed's Chinese counsel, believed the same.  Unlike a typical factoring arrangement, AgFeed received little or no money up front, but instead received only the promise that the factor would later make scheduled payments.  In sworn testimony, Webster estimated that the Company only received about $100,000 from the factor despite ceding rights to $22 million in receivables.

49.    In early May 2011, Daignault informed Pazdro (now the formal CFO), Rittereiser and Audit Committee chair Gothner that he had discovered that the China managers had been keeping two sets of books: an internal book and an external book (a false book), the latter of which had formed the basis of AgFeed's public reports.  Pazdro and Gothner initiated a further investigation and brought on Yang to investigate.  Yang concluded, through witness accounts and documentary evidence obtained in China, that AgFeed's China managers maintained two sets of books for the purpose of inflating revenue and profits; the accounting scheme was widespread; and AgFeed's Chinese managers had recently ordered the destruction of the second set of books.

17

50.     While their internal investigation continued and further accounting irregularities and infirmities were revealed, Goldman failed to make subsequent or any material disclosures to the SEC or the public of the Company's accounting issues.

51.     In late August of 2011, AgFeed sent McClelland, who was now AgFeed's COO, to China to conduct a further investigation.  McClelland summarized his findings in a report dated September 6, 2011 (the "McClelland Report").  The McClelland Report identified extreme mismanagement of the Chinese operations, such as the purposeful recording of false entries on the legacy farm accounting books in 2009, and that accounting system controls in the legacy farm system remained virtually non-existent.  McClelland set forth his findings which included evidence of non-existent hog farms purchased with the proceeds of funds raised pursuant to AgFeed's 2007 SEC Form S-3 Shelf Registration. *Promptly reported on management assessment of ICFR. No serious issues were noted.*

52.     McClelland's findings corroborated the scheme discovered earlier in 2011 and re-confirmed the import of the serious accounting and operational red flags.

53.     Shortly after receiving the McClelland Report, the Board authorized the formation of a Special Committee to investigate the extent of the issues in China.  Webster was appointed Chair of the Special Committee.  On January 2, 2012, Webster rendered his opinion to the Board that full disclosure of AgFeed's losses in China attributable to the non-existent Chinese farm assets and related party transactions, the dual sets of books maintained by the Chinese entities, and the real losses caused by the unauthorized factoring arrangement, should be made public in a report to be prepared in both English and Mandarin.

54.     On December 16, 2011, AgFeed filed a Form 8-K with the SEC admitting that AgFeed's financial statements filed from 2008 through most of 2011 were false and unreliable due to "accounting improprieties" within AgFeed's Chinese legacy hog production business.

### C.   Goldman's Negligent Audit of AgFeed's Financial Statements and Assessment of its Internal Controls

#### 1.  AgFeed's 2008 and 2009 Financial Statements

55.    As described above, there was patently obvious fraudulent activity occurring and Goldman failed to detect it. Steps as simple as verifying purchased assets—entire farms—would have revealed that AgFeed's financial statements were riddled with material misstatements.

56.    Upon information and belief, Goldman was hired to audit the Company's internal controls over financial reporting and to audit the financial statements for the years ending 2008 and 2009.[9]  Despite AgFeed having substantial operations in China, Goldman had no office in China.[10]  Instead, to conduct audit work in China, Goldman retained one of two audit firms: BETL or Anshun.  Goldman's involvement was limited to drafting a planning memo and training Anshun or BETL personnel;[11] therefore, Goldman essentially outsourced to Anshun and BETL significant portions of the Company's audit.

*[handwritten margin note: profusity Reported on ICFR on mongant behalf. ICFR were operating Effectively]*

57.    Upon information and belief, Goldman was obligated to (a) perform its audit in accordance with standards established by the Public Company Accounting Oversight Board ("PCAOB"), (b) design the audit to obtain reasonable assurance of detecting errors, fraud, or illegality that would have a material impact on financial statement amounts, and (c) obtain reasonable assurance that effective internal control over financial reporting was maintained in all

---

[9]  Goldman served as AgFeed's external, independent auditor from 2006 to 2010 and was responsible for auditing the books and accounts of AgFeed and its subsidiaries.  Goldman was hired for special projects from 2011 to 2013, but did not audit the Company's year-end financial statements during this time period.

[10]  Source: Goldman Kurland & Mohidin report to PCAOB for period beginning April 1, 2011.

[11]  Sources: AgFeed Industries, Inc., letter to Securities and Exchange Commission dated August 17, 2007, answer to question 34 [unpaginated]; China Recycling Energy Corporation, letter to SEC dated August 31, 2010, answer to question 8 [unpaginated].

material respects, which required Goldman to obtain an understanding of internal controls over

financial reporting, assess the risk.[12]

58.    For both of the Company's 2008 and 2009 10-Ks, Goldman reported that it

performed its audit work in accordance with applicable professional standards and that AgFeed's

financial statements fairly stated in all material respects in accordance with Generally Accepted

Accounting Principles ("GAAP"), and that effective internal controls over AgFeed's financial

reporting were in place.  But in reality, Goldman's financial statements fell far short of the

governing professional standards in several respects.  If Goldman had performed its audit

according to applicable standards, it would have easily discovered the rampant fraud and AgFeed

could have avoided the lawsuits that plagued its final days before having to file for bankruptcy.[13]

As the chronology of events above demonstrates, Goldman caused or ratified behavior ranging

from professional malpractice to gross negligence.  From the spring of 2008, there were many

accounting irregularities in the legacy farm operations and multiple red flags should have alerted

---

[12]   According to AgFeed's 2009 10-K, Goldman was "selected by the audit committee of our board as the independent registered certified public accounting firm to audit the books and accounts of our company and its subsidiaries for the fiscal year ending December 31, 2009.  This firm has served as independent public accountants for our company since 2006."  The Plaintiff obtained Goldman's engagement letter for AgFeed Animal Nutrition, Inc., which was a subsidiary of the Company.  The engagement letter provided that Goldman was to perform reviews of the Company's unaudited financial information for the quarters ending March 31, 2010 and 2009, June 30, 2010 and 2009, and September 30, 2010 and 2009.  The letter further provides that the audit "will include obtaining an understanding of internal control sufficient to plan the audit and to determine the nature, timing, and extent of audit procedures to be performed."

[13]   In 2011, two separate actions were brought against AgFeed and certain of its officers and directors by certain shareholders in the United States District Court for the Middle District of Tennessee and which were consolidated as *Blitz v. AgFeed Industries, Inc., et al.*, Case No. 3-11-cv-0992.  These class action plaintiffs alleged damages resulting from violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934,15 U.S.C. §§ 78J(b) and 78t(a), and SEC Rule 10b05 promulgated thereunder by SEC, 17 C.F.R. § 240.10b-5.  Additionally, on March 11, 2014, the SEC filed a complaint in the United States District Court for the Middle District of Tennessee styled the *Securities and Exchange Commission v. AgFeed Industries, Inc. et. al.* (Case No. 3:14-cv-00663).  The SEC alleged that from May 1, 2008 through December 19, 2011, violations of: Section 17(a) of the Securities Act of 1933, Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), and 13(b)(5) of the Securities Exchange Act of 1934, and Rules 10b-5, 12-20, 13a-11, and 13a-13 by AgFeed Industries and certain officers and directors in connection with the financial reporting and disclosures made by AgFeed Industries.

Goldman that fundamental accounting issues existed.   However, Goldman willfully ignored these flags and failed to adequately and timely investigate and address these issues.

### 2. Goldman Failed to Comply with Applicable Professional Auditing Standards

59.     Goldman did not exercise due professional care in auditing the Company's internal controls and financial statements for 2008 and 2009.   Upon information and belief, Goldman's 2008 and 2009 audits of the consolidated financial statements of AgFeed and the effectiveness of AgFeed's internal controls over financial reporting were "integrated audits." Under PCAOB requirements, integrated audits by a PCAOB-registered public accounting firm, such as Goldman, must be conducted in accordance with PCAOB Auditing Standards.   The PCAOB has adopted many of the Generally Accepted Auditing Standards ("GAAS").   For ease of reference, GAAS standards that were adopted by the PCAOB will be referred to as GAAS and cited as AU.[14]   Standards enacted by the PCAOB itself will be referred to as AS (Auditing Standard).

60.     GAAS and AS require the auditor to understand (i) the audit client, customer relationships, industry conditions, economic conditions, regulatory environment, relevant accounting pronouncements, and other external factors; and (ii) the internal controls that the audit client has in place to determine whether they are designed properly and operate effectively.

61.     To comply with GAAS, an auditor must identify risks of material misstatement at appropriate levels of detail, and design appropriate auditing procedures in light of such risks. Due professional care requires the auditor to exercise professional skepticism—i.e., a questioning mind and a critical assessment of audit evidence based on the assumption that management is neither dishonest nor honest beyond doubt.

---

[14] AU stands for interim audit standards of the PCAOB.

62.     Under GAAS and AS requirements, which audit procedures the auditor selects generally depend on the risk of material misstatement.  The higher the auditor's assessment of risk, the more reliable and relevant the audit evidence obtained from tests of the effectiveness of internal controls and substantive audit procedures must be.  The auditor must plan and perform the audit to obtain sufficient competent evidential matter to afford a reasonable basis for an opinion regarding the financial statements and to reduce to a low level the risk that the auditor will fail to detect a material misstatement. If the auditor is unable to obtain sufficient competent evidential matter, the auditor should express a qualified opinion or a disclaimer of opinion.

### a.  Goldman and its hired third-party auditors were not independent

63.     Goldman was not independent as is required under GAAS.  Under AU section 220, an auditor must "maintain independence in mental attitude in all matters relating to the audit."  An auditor must be "without bias with respect to the client since otherwise he would lack that impartiality necessary for the dependability of his findings, however excellent his technical proficiency may be."  AU § 220.

64.     Goldman violated GAAS's independence standard and misrepresented its own independence.  Far from being independent, Goldman was deeply beholden to AgFeed's stock promoter, Wey.  AgFeed's auditing engagement was secured and overseen by Mohidin, who himself was deeply beholden to Wey and profited substantially from his decade-long relationship. As detailed by a leading investigative reporter, Wey consistently caused the shoddy Chinese reverse mergers he brought public to engage Mohidin's firm (originally Kabani and more recently Goldman) as its "independent" auditor.[15]  This created a steady and profitable revenue stream for Mohidin and his firms, including Goldman.

---

[15] Source: http://www.thefinancialinvestigator.com/?p=529

65.     Wey and Mohidin had a reciprocal relationship.  Using his control of management personnel, Wey ensured that his client companies would steer audit business to Mohidin. Mohidin, in turn, provided soft audits that allowed the companies to hide financial irregularities and/or deficiencies in the companies' internal controls.  In addition to its own ties with Wey, Goldman retained third-party Chinese accounting firms BETL and Anshun that were also under Wey's influence to perform critical field work.  BETL and Anshun worked out of the same Chinese office building of Wey's firm, NYGG, and had a side door that opened directly into NYGG's office.[16]  According to one visitor, BETL even shared a computer server with NYGG. BETL and AnShun, consistently provided field work on audits of Wey-promoted companies and, on information and belief, such field work was the primary source of their revenues.

66.     Wey unduly influenced Mohidin and directed how the Company would report its financial statements.  For instance, in an email dated March 20, 2008, Mohidin recommended to Staloff, Pickard, and Li how the Company should treat on the Company's financial statements the recent acquisition of hogs and certain assets.  Wey disagreed with his analysis and told him he would speak with him later.  Similarly, on May 2, 2008, North emailed Mohidin, Pickard, and Summer Xie and explained the requirements for filing a Form 8-K and concluded that the Company must file it due to the hog farm acquisitions.  Wey's response reveals just how much contact and direction he gave to Mohidin: "I have discussed with Ahmed [Mohidin] numerous times in the past about each specific hog farm acquisition and each hog farm's value that may trigger audit requirements.  I don't think these hog farms individual fall into the audit requirements . . . .  Therefore, disagree with the conclusions listed below."  Upon information and belief, Wey is neither a certified public accountant nor attorney.  He nonetheless seems to command Mohidin to disagree with North's analysis.

---

[16] *Id.*

67.     Even the directors and officers of the Company understood how Wey influenced the reporting of financial information.  On March 5, 2009, Rittereiser wrote in an email to Daignault, Staloff, and Jacquelyn Hart that "BEN WEI EXERTED INFLUENCE IN (the past) [sic] VARIOUS WAYS ON HOW AGFEED WOULD REPORT INFORMATION[.]  The forensic work I have done with Gerry . . . while preparing for the 10k has revealed multiple inconsistencies . . ." (capitals in original).  In the same email, Rittereiser admonishes Wey for his influencing the estimates for healthy sow birth rates and characterizes Wey's estimates as "sheer nonsense and typical Ben Wei."  Similarly, in an email exchange dated May 22, 2009, Daignault described the rationale for terminating Goldman as a "move away from Kevin and Ahmed because of past baggage," to which Li responded favorably as a move to "get rid of those who have connection with 'that guy.'"  On information and belief, "that guy" referred to by Li was Wey, and "Kevin" was Pickard.

### b. Goldman did not adequately plan the audits and supervise BETL and Anshun

68.     Goldman failed to exercise "due professional care in the planning and performance of the audit and preparation of the report."  AU § 230.  Goldman had the responsibility to "observe the standards of field work and reporting" and was required to exercise "professional skepticism" throughout its audits.  *Id.*  The first standard of field work requires that the work is to be adequately planned and assistants are to be properly supervised. AU § 311.

69.     Goldman failed to exercise due professional care in planning and performing the audit for two principal reasons.  First, Goldman outsourced virtually all of the field work to a third-party entity, BETL and/or Anshun, and lacked reasonable assurance that BETL and/or Anshun had adequately determined the fair value of assets, including property, equipment and inventory in the hog business and accounts receivable and a corresponding allowance for

24

doubtful accounts in the animal feed business. Indeed, upon information and belief, in a review of a Goldman's audit of AgFeed by the PCAOB, the PCAOB's investigators found that the audit "included deficiencies of such significance that it appeared to the inspection team that the Firm did not obtain sufficient competent evidential matter to support its opinion on the issuer's financial statements."[17]

70.     Second, Goldman recklessly disregarded numerous red flags indicating a likelihood that AgFeed's financial statements were not "free of misstatement" and that AgFeed did not maintain "effective control over financial reporting."   GAAS 37 provides that an auditor's "professional care requires the auditor to exercise professional skepticism," including having "a questioning mind and a critical assessment of audit evidence." *See also* AU § 311. To exercise this duty, an auditor must consider known external and internal factors that create incentives for misrepresentation or provide the opportunity for fraud to be perpetrated. Moreover, an auditor is not free to disregard red flags, but instead must "acquire additional evidence as necessary . . . rather than rationalize or dismiss" suspicious information. *Id.* Had Goldman exercised the required skepticism, as Wu admitted, it would have "easily" discovered the fraud. *See* Paragraph 26 above.

71.     Despite these obligations, Goldman repeatedly and recklessly disregarded red flags that alerted it to the existence or at a minimum the possibility of fraud. By the time that Goldman had issued its audit reports in 2008 and 2009, Goldman knew or should have known that Wey's reverse-merger stock promotions were riddled with fraud, and that Wey himself had

---

[17]  The Plaintiff is informed and believes that the audit in question involved AgFeed. While the PCAOB Release does not expressly indicate that the Goldman audit found to be deficient was an AgFeed audit, the correspondence in the release indicated that the audit involved the mispricing of breeder hogs and hog breeding equipment in a manner that could only refer to AgFeed. In particular, those assets referred to in the PCAOB Release tracks with those assets later found to be misstated in AgFeed's hog business. Moreover, the Plaintiff is not aware of other Goldman clients involved in the breeding hog business.

been charged with improprieties by the State of Oklahoma and by investors in another Wey firm that Goldman audited, Bodisen Biotech. Goldman also knew or should have known that prior to its fiscal year 2008 and 2009 audits, AgFeed had deficiencies in its internal and financial reporting controls, and further knew that the Chinese hog operations AgFeed acquired in 2007 and 2008 had not previously been audited consistent with GAAP standards. Goldman's failure to follow up on these red flags violated GAAS.

### c. Goldman failed to obtain sufficient evidence to express an opinion on AgFeed's fixed assets and inventory

72.     Goldman did not obtain sufficient audit evidence and design and perform audit procedures to obtain sufficient appropriate audit evidence. AS No. 15, ¶ 1. Goldman did not obtain appropriate audit evidence that was sufficient to support the opinion expressed in its audit opinions for, among other things, the fixed assets and inventory of the Company. *Id.* at ¶ 2. Goldman was required, by suitable observation, tests, and/or inquiries, to gain assurance and understanding of the effectiveness of the methods of inventory-taking. AU § 331.09. It is always necessary for an auditor to observe some physical counts of the inventory and should be coupled with inspection of the records of any client counts and procedures relating to the physical inventory. AU § 331.12.

73.     The audit opinions Goldman issued for 2008 and 2009 were materially false and misleading because it materially misstated the value of AgFeed's fixed assets and inventory. The managers of the China legacy farm operations reported the purchase and ownership of tens of millions of dollars of fictitious assets. The books and records of the China legacy farms, which Goldman was responsible for auditing, were fraught with patently obvious indicia of fraud. Management at the legacy farm divisions created non-existent assets and inflated

26

revenues. Notably, nonexistent assets were recorded; and even where they existed, hogs were not properly recorded at the lower value of cost or market ("LCM").

74.   In 2011, a whistleblower reported allegations that there were "off books records" and overstated assets. Management hired Protiviti to investigate the whistleblower's allegations and the fixed assets of the legacy hog farm division. On August 1, 2011, Protiviti presented its findings to the Board. The results of Protiviti's findings demonstrate that Goldman did not obtain sufficient support to "sign off" on the Company's inventory and fixed asset account balances: purchase documentation to support capital expenditures was insufficient to determine the actual cost paid for assets; many of the high-dollar assets were described as having been paid for in cash and undeposited cash receipts were used to pay capital expenditures; payees for many fixed asset purchasers were individuals, and in some instances, were AgFeed customers; and an independent appraisal was required to assess valuation.

75.   Furthermore, on November 16, 2011, Elaine Lai ("Lai") —a senior level accounting employee for M2P2 and who assisted McClelland in investigating legacy farms— emailed Clay Marshall and McClelland and described her observations regarding the account review of the fixed assets at legacy farms. Her findings demonstrate Goldman's oversight of conspicuous accounting issues: there was no supporting documentation for an asset that was booked at over $3 million; no construction licenses and approval for various construction projects; many of the construction projects were paid in large amounts of cash with "no audit trail of the payment"; no tax invoices form the contractors; and regarding eleven property, plant, and equipment items, there was "no objective evidence to prove the ownership of these [fixed asset] items recorded in Legacy's Fixed Asset subledger."

27

76.     The McClelland Report identified extreme mismanagement of the Chinese operations, such as the purposeful recording of false entries on the legacy farm accounting books in 2009, and the fact that accounting system controls in the legacy farm system remained virtually non-existent.   The McClelland Report determined that there was evidence of non-existent hog farms; specifically, the McClelland Report provides that "[t]here are fixed assets recorded on the Legacy Farm books in 2009 and 2010 which in my opinion are outright fraud." The McClelland Report substantiated Lai's observations and stated that many of the legacy farm sales were cash sales without any supporting documentation.    With such a lack of documentation, Goldman could not have obtained sufficient audit evidence to support its 2008 and 2009 unqualified audit opinion over the Company's fixed assets. *See* AS No. 15.

77.     As noted above, on January 2, 2012, Webster rendered his opinion to the Board that full disclosure of AgFeed's losses in China attributable to the non-existent Chinese farm assets and related party transactions, the dual sets of books maintained by the Chinese entities, and the real losses caused by the unauthorized factoring arrangement, should be made public in a report to be prepared in both English and Mandarin.   Moreover, on April 8, 2012, Pazdro emailed Charles Yin and described the fixed asset and inventory scheme as involving "fabricating fixed assets for the purposes of inflating revenues.  Quarterly market hog data would indicate this scheme began in Q2 2008 and an effort to unwind it commenced in Q2 2010."

78.     While a blatantly obvious fraud was taking place during 2008 and 2009, Goldman either ignored or failed to acknowledge that millions of dollars in assets and inventory did not even exist, had been sold to others, or were grossly overvalued.   Goldman could not have obtained sufficient evidence to gain comfort over the Company's inventory and assets without having noticed such a massive fraud.

### d. Goldman failed to investigate and appropriately allocate the allowance for doubtful accounts

79.     Although AgFeed's receivables grew sharply from 2008 to 2010 its allowance for doubtful accounts largely remained the same. By having an artificially low accrual rate for doubtful accounts, the Company was able to boost its financial results. Goldman was aware, or recklessly disregarded, that the Company's doubtful accounts were not in accordance with GAAP. Goldman could have discovered with minimal due diligence and investigation that AgFeed's account receivable consisted, in large part, of uncollectible debts.

80.     Goldman violated GAAP by allowing AgFeed to maintain such a low allowance for doubtful accounts. The GAAP standard for accounting of allowances for doubtful accounts receivable, as well as other loss contingencies, is set forth in the Financial Accounting Standards Board's Statement of Financial Accounting Standards ("FAS") 5. Under paragraph 8 of FAS 5:

> An estimated loss from a loss contingency shall be accrued by a charge to income if both of the following conditions are met: (a) information available prior to issuance of the financial statements that it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements [and] (b) the amount of loss can be reasonably estimated.

81.     Under paragraph 22 of FAS 5, losses from uncollectable receivables should be accrued when it is probable that the reporting entity will not be able to collect all accounts receivable when due, and can reasonably estimate the overall amount of losses. It is not necessary that the reporting entity be able to identify the particular receivables that are uncollectible; rather, "the allowance for doubtful accounts is fungible and applicable to the balance of receivables as a whole." FAS 5, Paragraph 22. FAS 5 identifies the following evidence as relevant to determining the amount to accrue: (a) experience of the enterprise or reference to the experience of other enterprises in the same business; (b) information about

particular debtors' ability to pay (i.e.- credit reports, defaults, bankruptcy, financial statements); and (c) appraisal of the receivables in light of the current economic environment.

82.     AgFeed's SEC filings indicate that its underaccrual of losses from doubtful accounts was not caused by any inability to reasonably estimate those losses.  Had Goldman been unable to reasonably estimate all or any part of those losses, GAAP required it to report the nature of any reasonably possible losses and, in lieu of accruing for doubtful accounts, provide either a range of probable losses or a statement that such an estimate cannot be made.  *See* FAS 5.  Goldman failed to properly indicate on AgFeed's 10-Ks an amount that that was reflective of amounts that were uncollectible in violation of GAAP.

83.     At the very least, Goldman had a duty to investigate and failed to do so in the face of a relatively miniscule and constant doubtful account amount when AgFeed's receivables from 2008 to 2010 grew tremendously—$9,462,380, $14,397,793 and $21,872,121 respectively—without a concomitant increase in the doubtful account amount.  Indeed, during this time, and as AgFeed acknowledged in its SEC filings during this time period, deterioration of credit markets could adversely affect its customers and increase its bad debts.  Goldman knew or should have known that the hog farmers who bought AgFeed's animal feed products were pressured by the rising price of corn, which had to be mixed with AgFeed's product and, according to AgFeed, comprised 60% of the overall hog feed cost.  Additionally, Goldman knew or should have known knew that China's hog farmers had boosted inventory in advance of China hosting the 2008 Summer Olympic Games, and were selling off inventory thereafter, pressuring hog prices and therefore margins for end users of its animal nutrition products.  Goldman's decision to allow the Company to lower its reserve rates in the face of worsening economic trends and known problems directly violated FAS 5.

84.    Surprisingly, Goldman did not even uncover that there were profits from non-existing businesses.  In a July 10, 2009 email between Xiong and Wu, Xiong conceded that the accounts receivable were also inflated because "[t]he profits of the non-existing businesses are all kept in the accounts receivables."  She warned that "[t]his can be easily detected by [the] external auditor."

85.    Therefore, Goldman had no reasonable basis for allowing such a low doubtful account amount when AgFeed's receivables were allegedly skyrocketing, AgFeed continued expanding into new markets and extending credit to new customers, and suppliers throughout the world were experiencing historical economic woes.  Goldman knew or should have known that end users for AgFeed's products were facing both macroeconomic and industry-specific difficulties.  Goldman had a duty to adjust AgFeed's doubtful account to reflect the changing composition of its receivables, the economic status of its customers, and the then-current economic trends.  Goldman also had no reasonable basis to book invalid debts as "receivables."  Nevertheless, by artificially lowering AgFeed's reserve for doubtful accounts and boosting AgFeed's reported accounts receivable net of doubtful accounts, Goldman negligently signed off on artificially high earnings to the detriment of the Company.

### e.  Goldman's failure to properly evaluate internal controls

86.    For public companies like AgFeed, Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX 404") makes corporate management responsible for assessing the effectiveness of internal controls over financial reporting.  As part of its integrated audit, AS No. 5 required Goldman to render an opinion on the effectiveness of these internal controls.  Goldman was further required to test the effectiveness of AgFeed's internal controls if Goldman intended to rely on such controls in order to limit the substantive audit procedures that it performed.

Goldman concluded in the Company's 2008 and 2009 10-Ks that the internal controls over financial reporting were effective and that there was no material weakness or significant deficiency discovered. AgFeed switched auditors in 2010 and the internal control assessment stood in stark contrast to the Company's 2008 and 2009 10-Ks. The Company reported on its 2010 10-K that material weaknesses were identified—and one of those material weaknesses noted was that there were ineffective controls over review of the Company's financial statements.

87.     Goldman failed to identify significant and material weaknesses in the Company's internal controls and erroneously concluded that AgFeed's internal controls were adequate for year-ends 2008 and 2009. "A control deficiency exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis." AU § 325, ¶ 1. Not all deficiencies are of the same ilk: a significant deficiency is a deficiency is important enough to merit attention by those responsible for oversight of the company's financial reporting; a material weakness is a deficiency "such that a there is a reasonable possibility that a material misstatement of the company's annual . . . financial statements will not be . . . detected on a timely basis." AU § 325, ¶ 2-3.

88.     Goldman did not obtain a sufficient understanding of the Company's internal control structure to allow it to assess the audit risk associated with AgFeed's inadequate internal controls. *See* AU § 31. In a July 10, 2009, Xiong emailed Jiangqi Wu and expressed concern over the lack of internal controls. He stated that there was a lack of internal control over the sales and the "security of the payments (high likelihood of bad debts or misappropriation)." Notably, he said that there were no internal controls at all for inventory, fixed assets, and sales.

89.    The McClelland Report supports Xiong's July 10, 2009 email. The McClelland Report concluded that there was gross mismanagement of the Chinese operations, such as the purposeful recording of false entries on the legacy farm accounting books in 2009, and virtually no controls in the legacy farm system. Regarding the legacy farms division, the McClelland Report determined that "there was no inventory control system to record either the production of live animals nor [sic] the sales of live animals in a manner that would allow for any sort of management reporting . . . ." It further noted that that the financial statements reported at the farms were not reviewed by management, and when the summary reports were provided they were in English—a problem if your management and accounting personnel cannot read English as was the case for AgFeed's management in China.

90.    In December 2011, Protiviti confirmed Xiong and the McClelland Report's conclusions in its presentation to the Board regarding AgFeed's 2011 SOX control design and operation summary results. Protiviti found that there were many control design deficiencies: lack of independence of internal audit function; lack of approval and issue of account manual; material weakness regarding social insurance; personal accounts used for sales of funds collection; lack of security within critical systems/applications; and lack of formal controls for verifying physical existence of traditional fixed assets.

91.    Protiviti further found that there were many notable control operation gaps: social insurance was not fully withheld and remitted; no individual income tax was withheld and remitted at certain locations; lack of timely reconciliation with customers; lack of review of evidence for accounts receivable aging analysis; lack of tax invoices for purchases; lack of formal controls for fixed asset additions; lack of formal controls for verifying physical existence of fixed assets; and lack of control evidence.

92.     Finally, the 2008 10-K falsely represented that internal control deficiencies had been remedied, primarily by the implementation of security controls and a comprehensive accounting and enterprise resource planning ("ERP") system.

### f.  Goldman negligently issued unqualified audit opinions

93.     Goldman recklessly and negligently issued unqualified audit opinions for the Company's 2008 and 2009 year-end financial statements. Goldman's audits were not conducted consistent with GAAP and it ignored glaring red flags that required further investigation.

94.     The 2008 10-K contained, by express consent, the audit report of Goldman. Goldman's audit report falsely characterized Goldman as an "independent" auditing firm, assured investors that Goldman conducted a reasonable audit, and concluded that:

> the financial statements referred to above present fairly, in all material respects, the financial position of AgFeed Industries, Inc. as of December 31, 2008, and 2007, and the results of its operations and its cash flows for the years ended December 31, 2008 , 2007 and 2006, in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, AgFeed Industries, Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2008, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

95.     Goldman's 2008-K audit opinion was materially false and misleading because: (a) Goldman knew or should have known that AgFeed had not completed its implementation of the ERP software, which was meant to remedy prior internal control deficiencies; (b) Goldman failed to identify material misstated key assets—including inventory and equipment—and even failed to identify fabricated assets that did not exist; (c) Goldman under-reserved for doubtful accounts and had not, as it represented, adjusted the reserves to reflect the changing composition of its receivables, the economic status of its customers, and then-current economic trends; (d) as a result of (b) and (c) and for the other reasons noted above, the Company's financial statements

34

did not comply with GAAP and did not fairly represent the financial affairs of the Company; (e) Goldman was not an independent auditing firm but was instead beholden to Wey; and (f) Goldman had not conducted a reasonable audit of the Chinese operations and thus was unable to meaningfully determine whether the Company's stated asset values, inventories, allowances, and receivables were accurately reflected on the Company's financial statements.

96.     As a direct result of Goldman's negligent attestation that AgFeed's financial statements were accurately reflected and its internal controls were sufficient, the Company was able to raise $10 million in a PIPE offering on or around May 7, 2009.

97.     Likewise, Goldman's audit of AgFeed's 2009 financial statements was negligently performed.  On the Company's 2009 10-K, the Company reported net income of $10.35 million and revenue of $173.2 million, as compared to net income of $16.95 million and revenue of $143.66 million for the same period the previous year.  It represented that the financial statements were prepared in accordance with GAAP, and stated that the Company's disclosure controls and procedures were effective.  Furthermore, the 2009 10-K reported $23.84 million in inventory at the end of the fiscal year, $26.99 million in equipment and property (consisting primarily of $13.43 million in breeding hogs), $14.4 million in accounts receivable, net of an allowance for doubtful accounts of only $415,765.  Despite rapidly increasing revenues in a difficult macroeconomic environment, the 2009 10-K stated that AgFeed only accrued $196,005 in bad debt expense for 2009.  The 2009 10-K reported $14.4 million in accounts receivable balance as of December 21, 2009, and an allowance for doubtful accounts of only $415,765.

98.     The 2009 10-K also contained, by express consent, the audit report of Goldman.
Goldman's audit report falsely characterized Goldman as an "independent" auditing firm,
assured investors that Goldman conducted a reasonable audit, and concluded that:

> the consolidated financial statements referred to above present fairly, in all
> material respects, the consolidated financial position of AgFeed Industries, Inc.
> and subsidiaries as of December 31, 2009, and 2008, and the consolidated results
> of their operations and their cash flows for the years ended December 31, 2009,
> 2008 and 2007, in conformity with accounting principles generally accepted in the
> United States of America. In our opinion, the related financial statement schedule,
> when considered in relation to the basic financial statements taken as a whole,
> presents fairly, in all material respects, the information set forth therein. Also in
> our opinion, the Company maintained, in all material respects, effective internal
> control over financial reporting as of December 31, 2009, based on criteria
> established in Internal Control-Integrated Framework issued by the Committee of
> Sponsoring Organizations of the Treadway Commission (COSO).

99.     Goldman's 2009-K audit opinion was materially false and misleading because (a)
Goldman knew or should have known that AgFeed had not completed its implementation of the
ERP software, which was meant to remedy prior internal control deficiencies; (b) Goldman
failed to identify material misstated key assets—including inventory and equipment—and even
failed to identify fabricated assets that did not exist; (c) Goldman under-reserved for doubtful
accounts and had not, as it represented, adjusted the reserves to reflect the changing composition
of its receivables, the economic status of its customers, and then-current economic trends; (d) as
a result of (b) and (c) and for the other reasons noted above, the Company's financial statements
did not comply with GAAP and did not fairly represent the financial affairs of the Company; (e)
Goldman was not an independent auditing firm but was instead beholden to Wey; and (f)
Goldman had not conducted a reasonable audit of the Chinese operations and thus was unable to
meaningfully determine whether the Company's stated asset values, inventories, allowances, and
receivables were accurately reflected on the Company's financial statements.

D.    **PG Negligently Prepared and Reviewed AgFeed's 10-Ks and 10-Qs**

100.   Pursuant to PG's engagement letter, dated January 7, 2010 (the "2010 Engagement Letter"), PG agreed to assist the Company with the (1) preparation of its annual financial statements for the year ended December 31, 2009 and its quarterly financial statements for the quarters ended March 31, 2010, June 30, 2010 and September 30, 2010; (2) review the Company's 10-K and 10-Qs prior to filing with the SEC; and (3) preparation of any required supporting documentation required by the Company's public accounting firm.  PG was required to perform the same services for 2011.  PG's engagement letter for 2011, dated January 19, 2011 (the "2011 Engagement Letter"), provides for the same services as the 2010 engagement letter.  Both engagement letters provide that the Company's financial statements will be prepared in accordance with GAAP.

101.   Based on PG's engagement letters, they were hired to perform a combination of a "compilation" and "review" engagement.  These terms are specialized terms under the American Institute of Certified Public Accountants ("AICPA") and Statement on Standards for Accounting and Review Services ("SSARS").  Certified public accountants are governed by SSARS when they provide such services to their clients, and by the professional standards of the Rules of Conduct of the AICPA Code of Professional Ethics Statements.

102.   As a general matter, the objective of a compilation engagement is to apply accounting and financial reporting expertise to assist management in the presentation of financial statements, but does not require the accountant to obtain or provide any assurance that there are no material modifications that should be made to the financial statements in order for them to be in accordance with the applicable financial reporting framework.

103.   A "review" engagement, however, provides a higher level of assurance.  The accountant must obtain limited assurance as a basis for reporting whether the accountant is aware

37

of any material modifications that should be made to the financial statements for them to be in accordance with applicable financial reporting framework, which in our case, is GAAP. To obtain such limited assurance requires inquiries of client management and well planned analytical procedures. *See* SSARS No. 19.04. Commonly used analytical devices include comparing current-period financial statements with prior periods, identifying items or relationships between items that do not conform to expectations based on inquires and reports, and analyzing proposed adjustments to the financial statements. At its core, the inquiries and analytical devices should be designed to allow the accountant to identify accounts that appear unusual so further investigation can be made.

104.    Rule 201 of the AICPA's Code of Professional Conduct requires that the accountant "shall obtain sufficient relevant data to afford a reasonable basis for conclusions or recommendations in relation to any professional services performed." It further provides that an accountant should exercise due professional care in the performance of the engagement, and should adequately plan and supervise the engagement. Rule 202 of the AICPA's Code of Professional Conduct specifically requires accountants who perform compilation, review or auditing services to comply with all professional standards.

105.    PG negligently compiled and reviewed the Company's annual and quarterly financial statements. As noted above, AgFeed's receivables grew sharply from 2008 to 2010, but its allowance for doubtful accounts largely remained the same. By having an artificially low accrual rate for doubtful accounts, the Company was able to boost its financial results. PG was aware, or recklessly disregarded, that the Company's doubtful accounts were not in accordance with GAAP.

106.    Under SSARS No. 1 as amended, PG should have applied analytical procedures to identify and provide a basis for inquiry about relationships and individual items that appeared to be unusual and that may have indicated material misstatements.  The underaccrual of losses from doubtful accounts was one such item.  PG had a duty to investigate and failed to do so in the face of a relatively miniscule and constant doubtful account amount when AgFeed's receivables from 2008 to 2010 grew tremendously without a concomitant increase in the doubtful account amount.

107.    PG was hired to review and compile all the Company's quarterly and year-end financial statements for 2009 and 2010.  The 2008 10-K reported $9.46 million in accounts receivable balance as of December 31, 2008, net of an allowance for doubtful accounts of $520,413.  The Q1 2009 10-Q reported $11.97 million in accounts receivable as of the end of the quarter, net of an allowance for doubtful accounts of only $282,958.  The Q2 2009 10-Q reported that AgFeed had $14.6 million in accounts receivable, net of an allowance for doubtful accounts of only $69,660.  The Q3 2009 10-Q reported $16.2 million in accounts receivable, net of an allowance for doubtful accounts of only $246,847.  The 2009 10-K reported $14.4 million in accounts receivable, net of an allowance for doubtful accounts of only $415,765.  Despite rapidly increasing revenues in a difficult macroeconomic environment, the 2009 10-K stated that AgFeed only accrued $196,005 in bad debt expense for 2009.

108.    PG was required to analyze the relationship of the Company's accounts and identify unusual balances that may indicate a material misstatement.  Increases or decreases in receivables disproportionate to increases or decreases in doubtful accounts could indicate a potential misstatement and required PG to investigate.  Seemingly, allowance for uncollectible receivables would increase in response to increased risk and large increases in receivables;

however, despite the increased risk factors in collecting and an alleged increase in receivables, the doubtful accounts amount remained the same.

109.   PG ignored AgFeed's risk factors and the macroeconomic climate that it was required to understand under Rule 201 of the AICPA's Code of Professional Conduct. AgFeed acknowledged in its SEC filings during this time period that deterioration of credit markets could adversely affect its customers and increase its bad debts. PG knew or should have known that the hog farmers who bought AgFeed's animal feed products were pressured by the rising price of corn, which had to be mixed with AgFeed's product and, according to AgFeed, comprised 60% of the overall hog feed cost. Additionally, PG knew or should have known knew that China's hog farmers had boosted inventory in advance of China hosting the 2008 Summer Olympic Games, and were selling off inventory thereafter, pressuring hog prices and therefore margins for end users of its animal nutrition products.

110.   In addition to the direct acknowledgment that the accounts receivable had been fabricated to hide non-existent profits, there is also overwhelming circumstantial evidence that accounts receivable stemming from even legitimate sales had been materially underreserved even though the Company unquestionably knew that collectability was becoming an increasing problem. On March 5, 2009, Rittereiser in an email wrote that the "forensic work I have done with Gerry . . . while preparing for the 10k has revealed multiple inconsistencies . . . ." In the same email, he said that "Pickard has been quite helpful because he wants the financial reporting to be on target and real. Please help us end this stuff once and forever . . . ." While most accountants would want the financial reporting to be "real," Rittereiser comments is telling: PG was at least vaguely aware that the Company had fundamental issues in its accounting

department.   Therefore, PG was on notice that fraud may be present and required close examination of the Company's financial reporting.

111.   However, notwithstanding the indicia of fraud and irregular account balances based on the history of the Company and market conditions, PG failed to obtain sufficient relevant data to afford it a reasonable basis for conclusions regarding the Company's financial statements.   PG should have performed additional procedures necessary to achieve limited assurance that there were no material modifications that should be made to the Company's quarterly and year-end financial statements.   PG failed to properly indicate on AgFeed's 10-Ks an amount that that was reflective of amounts that were uncollectible in violation of GAAP and thereby allowed AgFeed to artificially lower its allowance for doubtful accounts violated GAAP.

112.   Accordingly, PG had sufficient indicators to further investigate and modify the Company's low doubtful account amount when AgFeed's receivables were allegedly skyrocketing, AgFeed continued expanding into new markets and extending credit to new customers, and suppliers throughout the world were experiencing historical economic woes. Goldman knew or should have known that end users for AgFeed's products were facing both macroeconomic and industry-specific difficulties.   PG also had no reasonable basis to book invalid debts as "receivables."   Nevertheless, by artificially lowering AgFeed's reserve for doubtful accounts and boosting AgFeed's reported accounts receivable net of doubtful accounts, PG reviewed and approved the Company's artificially high earnings.

E.   **Post-Audit Revelations Demonstrate Goldman and PG's Negligence**

113.   On September 29, 2011, after the market closed, AgFeed filed a Form 8-K with the SEC conceding, *inter alia*, that there was sufficient questions as to the validity, as well as the collectability, of the accounts receivable from its animal nutrition business (constituting most of

the Company's overall accounts receivables), and of irregularities in accounting for assets in the hog division that provided the majority of AgFeed's revenues during 2008-2010, to warrant a special investigative committee to be chaired by Webster:

> AgFeed Industries, Inc. announced today that its Board of Directors has established a special committee to investigate the accounting relating to certain of the Company's Chinese farm assets (acquired during 2007 and 2008) used in its hog production business, as well as the validity and collectability of certain of the Company's accounts receivables relating to its animal nutrition business in China and any other issues that may arise during the course of the investigation.

114.   On November 10, 2011, AgFeed filed a Form 8-K with the SEC announcing that Audit Committee concluded that GAAP required it to cure its under-reserved accounts receivable in its animal nutrition business by recording an additional $7 million charge against earnings, above and beyond the charges previously disclosed.  The Company further conceded that the $7 million was related to Chinese court ordered settlement agreements entered between July 7, 2011 and July 28, 2011.

115.   On December 16, 2011, AgFeed filed a Form 8-K with the SEC admitting that the special investigative committee formed at the end of the relevant period concluded that, like AgFeed's 2008 financial statements, its financial statements for 2009, 2010, and 2011 were false and unreliable due to "accounting improprieties."  Specifically, the 8-K noted that "the Company's financial accounting staff and management based in China engaged in accounting improprieties during 2009 and 2010 and the first two quarters of 2011 in connection with AgFeed's Chinese legacy hog production business that they concealed from AgFeed's management in the United States."  The Company's December 16, 2011 8-K further provided that:

> After discussing the facts learned in the Investigation to date with management, the Company's audit committee concluded on December 16, 2011 that the Company's previously issued unaudited financial statements for the quarters

42

ended March 31 and June 30, 2011, as well as its audited financial statements for the years ended December 31, 2010 and 2009, should be restated. As a result, the Company's consolidated balance sheets as of March 31 and June 30, 2011 and December 31, 2010 and 2009, the Company's consolidated statements of operations and other comprehensive income (loss) for the quarters ended March 31 and June 30, 2011 and the years ended December 31, 2010 and 2009, the Company's consolidated statements of cash flows for the quarters ended March 31 and June 30, 2011 and the years ended December 31, 2010 and 2009 and the footnotes thereto should no longer be relied upon. Management discussed these matters with the Company's independent registered public accounting firms for the applicable periods. These restatements are in addition to those previously reported by the Company in its Current Report on Form 8-K filed with the Commission on November 10, 2011.

116.   On January 31, 2012, while its stock trading remained halted, AgFeed filed a Form 8-K announcing its intent to voluntarily delist its common stock from the NASDAQ.

### CLAIMS FOR RELIEF

### COUNT I
### Professional Negligence and Malpractice
### (Against Goldman and PG)

117.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

118.   Goldman negligently failed to discover that AgFeed's 2008 and 2009 financial statements were inaccurate and grossly misleading and that these financial statements contained material weaknesses.

119.   Goldman had a duty to exercise reasonable and professional care in providing audit services to AgFeed.  Specifically, Goldman owed a duty to AgFeed to: (a) audit AgFeed's 2008 and 2009 financial statements and internal controls in accordance with GAAP and all applicable professional and regulatory standards, including the PCAOB; (b) exercise the skill and care normally possessed by members of the accounting/auditing profession; (c) familiarize itself with AgFeed's business, operations, accounting policies, business risks, internal controls

(including its information systems, financial controls, and monitoring), and reporting methods; (d) plan and perform its audits to reduce audit risk to an acceptably low level given its understanding of AgFeed's business and its internal workings; (e) gather adequate and appropriate audit evidence and critically assess the audit evidence upon which to base its audit reports and finalize its audit reports pertaining to AgFeed's financial statements only after it had conducted all appropriate audit procedures; (f) determine whether AgFeed's 2008 and 2009 financial statements provided a true and fair view of AgFeed's financial position and of the results of its operations for the relevant period in accordance with GAAP; (g) and promptly alert the Board as to the existence of: (i) material weaknesses or failures in the Company's internal controls; (ii) inadequate management assessments or evaluations of controls; and (iii) any irregularities, other illegal acts or identified fraud, or actions by insiders that are indicative of fraudulent financial reporting.

120.    As a result of the acts and omissions set forth above, Goldman breached its duties to AgFeed by failing to perform audit and review services for AgFeed in a professionally competent manner and in conformity with applicable regulatory and professional standards, and by issuing an unqualified audit opinion on the 2008 and 2008 financial statements that were materially misstated and did not comport with GAAP.

121.    As a direct and proximate result of Goldman's negligence, AgFeed suffered damages, the amount of which shall be proven at trial.

122.    Additionally, PG negligently compiled and reviewed AgFeed's annual and quarterly financial statements.  PG owed a professional duty of care to the Company and to provide attestation services in accordance with SSARS.

123.    PG had a duty to exercise reasonable and professional care in providing compilation and review services.  PG owed a duty to AgFeed to: (a) review and analyze AgFeed's 2009 and 2010 10-Ks and all the quarterly statements for 2010 and 2011; (b) exercise the skill and care normally possessed by members of the account profession; (c) familiarize itself with AgFeed's business, operations, accounting policies, business risks, and the Company's reporting methods; (d) gather adequate and appropriate evidence and critically assess the evidence upon which to base its audit only after it has conducted all appropriate analytical procedures; and (e) determine whether AgFeed's 2008 and 2009 10-Ks and all the quarterly statements for 2010 and 2011 provided a true and fair view of AgFeed's financial position and of the results of its operations.

124.    As a result of the acts and omissions set forth above, PG breached its duties to AgFeed by failing to perform its duties in a professionally competent manner and in conformity with applicable professional standards.

125.    As a direct and proximate result of the Defendant's negligence, AgFeed suffered damages, the amount of which shall be proven at trial.

### COUNT II
### Gross Negligence
### (Against Goldman)

126.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein

127.    The misconduct of Goldman described above constitutes gross negligence.

128.    As a direct and proximate result of Goldman's gross negligence, AgFeed sustained significant damages in an amount to be proven at trial.

## COUNT III
### Breach of Contract
### (Against Goldman and PG)

129.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

130.   The 2010 Engagement Letter and 2011 Engagement Letter represent valid and enforceable contracts between PG and the Company.  PG agreed to, among other things, perform compilation and review attestation services for the Company in a competent and accurate manner, employ procedures to provide written assurances, notify and remediate issues with the Company's accounting records, and properly prepare the Company's annual 10-Ks for 2009 and 2010 and the Company's quarterly 10-Qs for the same time period.

131.   PG breached the terms of the 2010 Engagement Letter and 2011 Engagement Letter by, among other things: (1) failing to prepare and produce accurate financial information in the financial statements that it attested to for the periods described above; (2) failing to properly plan and employ sufficient procedures to obtain limited assurances of the Company's financial statements; (3) failing to compare financial statements and inquire with management regarding obvious accounting irregularities; (4) failing to remediate the problems with the Company's accounting records; and (5) failing to identify and inform management of unusual accounting entries.

132.   Upon information and belief, the Company performed all of its obligations under the 2010 Engagement Letter and 2011 Engagement Letter.

133.   As a direct and proximate result of PG's breach of the 2010 Engagement Letter and 2011 Engagement Letter, AgFeed was damaged in an amount to be proven at trial.

134.   Additionally, upon information and belief, Goldman breached the terms of its contract with the Company.  According to AgFeed's 2009 10-K, Goldman was hired to serve as the Company's independent registered certified public accounting firm to audit the books and accounts of the Company and its subsidiaries and evaluate the Company's internal controls.  Upon information and belief, Goldman entered into a contract with the Company to audit the Company's financial statements and internal controls for year-end 2008 and 2009.  Goldman breached the contract with the Company by (1) failing to prepare and produce accurate financial information in the financial statements that it attested to for the Company's 2008 and 2009 year-end financial statements; (2) failing to properly plan and employ sufficient procedures to obtain assurances of the Company's financial statements; (3) failing to effectively evaluate the Company's internal controls ; and (4) failing to obtain sufficient audit evidence to obtain comfort over the Company's year-end financial statements.

135.   Upon information and belief, the Company performed all of its obligations under the contract with Goldman.

136.   As a direct and proximate result of Goldman's breach, AgFeed was damaged in an amount to be proven at trial.

### COUNT IV
### Negligent Misrepresentation
### (Against Goldman and Four Tong and John Does 1 through 10)

137.   The Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

138.   As detailed above, Goldman's 2008 and 2009 audit opinions misrepresented that AgFeed's financial statements were fairly stated in all material respects and that effective

internal controls over financial reporting were in place because the financial statements were, in fact, grossly misstated and AgFeed's internal controls were deficient.

139.   AgFeed was a known and intended recipient and user of Goldman's audit opinions and reports, and Goldman knew that AgFeed and its investors would rely on their opinions and reports.  In justifiable reliance on these opinions, AgFeed was deprived of the opportunity to take steps that it would have taken to mitigate losses if these opinions and reports had been accurate and prepared in conformity with applicable professional standards.

140.   Goldman's negligent and grossly negligent misrepresentations caused AgFeed to suffer significant damage in an amount to be proven at trial.

141.   As a direct and/or proximate result of these breaches, AgFeed suffered financial harm.

142.   Additionally, the negligent representations, express and/or implied, made by Defendant Four Tong and John Doe Defendants 1 through 10 that false, inaccurate and/or incomplete AgFeed company and financial information was in fact complete and accurate when selling and/or placing AgFeed stock was justifiably relied upon by the investing public and by the current AgFeed shareholders to buy, overpay for and hold AgFeed stock.

143.   These negligent misrepresentations directly and proximately caused AgFeed and/or its shareholders to suffer significant harm and damage in an amount to be proven at trial.

## COUNT V
### Fraudulent Transfer pursuant to 11 U.S.C. § 544 and 11 U.S.C. § 548
### (Against Goldman)

144.   The Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48

145.   Between March 31, 2011 and the Petition Date, Goldman received transfers from AgFeed.   Based on AgFeed's books and records, Goldman collectively received transfers totaling approximately $250,000.

146.   The transfers were made within two years before the Petition Date.  The transfers were made to or for the benefit of Goldman.

147.   Each transfer was made without receiving reasonably equivalent value in exchange for such transfer, and on the date of the transfers AgFeed was insolvent or became insolvent as a result of such transfer, as a result of such transfers AgFeed was left with unreasonably small capital, or intended to incur or believe it would incurs debts beyond AgFeed's ability to repay such debts. *See* 11 U.S.C. § 548(a)(1)(A)

148.   Additionally, and in the alternative to the extent transfers were made to Goldman more than two years beyond the petition date, the Plaintiff moves under 11 U.S.C. § 544.

149.   AgFeed Industries LLC is a Nevada limited liability company.   AgFeed's domestic corporate headquarters at all relevant times was located in Hendersonville, Tennessee.  AgFeed USA LLC is a Delaware corporation.  AgFeed USA's primary domestic headquarters were located, at all relevant times, in Ames, Iowa.

150.   Nevada, Delaware, Tennessee, and Iowa have each adopted the Uniform Fraudulent Transfer Act, and the operative provisions of each state's fraudulent transfer statute are materially identical. *See* Nev. Rev. Stat. Ann. §§ 112.140 to 112.250 (Nevada); Tenn. Code Ann. §§ 66-3-301 to 66-3-315 (Tennessee); 6 Del. C. §§ 1301 to 1311 (Delaware); and I.C.A. §§ 684.1 to 684.12 (Iowa).  The statute of limitations for fraudulent transfer in Iowa is five years; the statute of limitations for fraudulent transfer in the other four states is four years.

151.   Upon information and belief, AgFeed paid (or caused its subsidiaries or affiliated companies to pay) Goldman fees for, among other things, auditing Company's 2008 and 2009 year-end financial statements and for work done in connection with the special committee investigation and related restatement issues from August 2012 to June 2013.

152.   AgFeed did not receive reasonably equivalent value in exchange for the fees it paid (or caused to be paid) to Goldman because, among other reasons as noted herein, Goldman's services were grossly negligent.

153.   As set forth at length above, during all times relevant hereto, AgFeed did not actually have the assets it reported on its books and records and, upon information and belief, was insolvent at the time it paid Goldman (or caused one of its subsidiaries of affiliated companies to pay Goldman) for its services.

154.   Under these circumstances, all fees paid to Goldman after July 15, 2009 amount to fraudulent transfers and should be returned to the Plaintiff.

## COUNT VI
### Recovery of Avoidable Transfers (§ 550)
### (Against Goldman)

155.   The Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

156.   If Goldman is found liable under Count V of this Complaint it was the initial transferee of the transfer(s).

157.   Upon the avoidance of transfers pursuant to section 548 of the Bankruptcy Code, or pursuant to applicable state law and section 544 of the Bankruptcy Code, the Plaintiff may recover the transfers, or the value of the transfers, from Goldman or any mediate or immediate transferee under section 550 of the Bankruptcy Code.

158. For these reasons, the Plaintiff may recover the transfers, or the value of the transfers, identified in Count V of this Complaint from Goldman under section 550 of the Bankruptcy Code.

## COUNT VII
### Disallowance of Claim pursuant to 11 U.S.C. § 502(d)
### (Against Goldman)

159. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

160. Goldman filed a proof of claim against the Debtor (the "Claim") in the amount of $312,231 for "professional services performed as a registered public accounting firm." According to the invoices attached to the Claim, Goldman seeks payment for work done in connection with the special committee investigation and related restatement issues from August 2012 – June 2013.

161. Section 502(d) of the Bankruptcy Code provides that unless an entity or transferee receiving payment avoidable under section 547 of the Bankruptcy Code has paid the amount for which such entity or transferee is liable under section 550 of the Bankruptcy Code, any claim of such entity or transferee shall be disallowed. Goldman has not surrendered to the Plaintiff or paid any proceeds received by them pertaining to the fraudulent transfers and as such any claim which Goldman has must be disallowed.

162. Furthermore, Goldman's Claim should be disallowed and expunged in its entirety for the reasons set forth in this Complaint. To the extent Goldman's Claim is not disallowed and expunged in its entirety, the amount thereof should be offset against the damages due and owing to Company in connection with the counts asserted herein.

## COUNT VIII
### Unjust Enrichment
### (Against Goldman and Four Tong and John Does 1 through 10)

163.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

164.   Goldman wrongfully benefited from and was enriched by its role as the Company's auditor by receiving payment for its services in connection with its grossly deficient services.

165.   The wrongful benefit and enrichment of Goldman was at the expense of AgFeed.

166.   Equity demands that retention of these payments and enrichment would be unjust.

167.   Likewise, Defendants Four Tong and John Does 1 through 10 wrongly and unjustly benefitted from, and were each enriched and compensated in, their respective role(s) in helping and assisting AgFeed to sell, issue and/or place stock to third-parties, including current AgFeed shareholders.

168.   The wrongful benefit and enrichment of Defendants Four Tong and John Does 1 through 10 was at the expense of AgFeed as defined herein and explained above.

169.   Equity demands that the retention of these payments and any compensation, in whatever form, would be unjust and therefore they must be provided and/or tendered back to Plaintiff.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

i.     Actual damages in an amount to be proven at trial;

ii.    Exemplary damages in an amount to be demonstrated at trial;

iii.   Return of any and all fees paid by AgFeed to Goldman;

iv.  Awarding the Plaintiff the costs and disbursements of the action, including

reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

and

v.  Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury trial in this matter.

Date:  July 15, 2015                    **ELLIOTT GREENLEAF, P.C.**
       Wilmington, Delaware

                                By:  */s/ Rafael X. Zahralddin-Aravena*
                                     Rafael X. Zahralddin-Aravena (DE No. 4166)
                                     Shelley A. Kinsella (DE No. 4023)
                                     Eric M. Sutty (DE No. 4007)
                                     1105 N. Market St., Ste. 1700
                                     Wilmington, DE 19801
                                     Telephone: (302) 384-9400
                                     Facsimile: (302) 384-9399
                                     Email: rxza@elliottgreenleaf.com
                                     Email: sak@elliottgreenleaf.com
                                     Email: ems@elliottgreenleaf.com

                                     –and–

                                     Mary E. Kohart
                                     **ELLIOTT GREENLEAF, P.C.**
                                     Union Meeting Corporate Center
                                     925 Harvest Drive, Suite 300
                                     Blue Bell, PA  19422-1956
                                     Telephone: (215) 977-1000
                                     Facsimile: (215) 977-1099
                                     Email: mek@elliottgreenleaf.com

                                     –and–

Aaron L. Hammer
Mark S. Melickian
Leland H. Chait
SUGAR FELSENTHAL GRAIS & HAMMER LLP
30 N. LaSalle St., Ste. 3000
Chicago, IL 60602
Telephone: (312) 704-9400
Facsimile: (312) 372-7951
Email: ahammer@SugarFGH.com
Email: mmelickian@SugarFGH.com
Email: lchait@sugarFGH.com

*Counsel to JLL Consultants, Inc., as Liquidating
Trustee of the AgFeed Liquidating Trust*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| AgFeed USA, LLC, et al. | : Case No. 13-11761 (BLS) |
| | : |
| Debtors. | : (Jointly Administered) |
| | : |
| JLL CONSULTANTS, INC., NOT INDIVIDUALLY BUT SOLELY AS TRUSTEE OF THE AGFEED LIQUIDATING TRUST, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Adv. Pro. No. 15-50929 |
| | : |
| GOLDMAN KURLAND & MOHIDIN LLP and PICKARD AND GREEN, CPAs, FOUR TONG INVESTMENTS, LTD., a/k/a and/or d/b/a FOUR TONG INVESTMENT LTD., and JOHN DOE DEFENDANTS 1 THROUGH 10, | : |
| | : |
| Defendants. | : |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that on the date below, a true and correct copy of the foregoing Motion for Withdrawal of Reference, the Certification Pursuant to Local Rule 7.1.1 and the Proposed Order thereof were served on all counsel of record via the Court's ECF system and sent via First Class Mail to:

Four Tong Investments, Ltd.
1603 Kinwick Centre
32 Hollywood Road
Central, Hong Kong, China

**TYBOUT, REDFEARN & PELL**

Dated: 12/4/2015

/s/ Seth J. Reidenberg
Seth J. Reidenberg
750 Shipyard Drive, Suite 400
P.O. Box 2092
Wilmington, DE 19899
T: 302.658.6901
F: 302.658.4018
sreidenberg@trplaw.com

*Attorneys for Defendant*
*Goldman Kurland & Mohidin LLP*